# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF NEW YORK

JACKSON L.,[1]

             Plaintiff,

   v.              5:19-CV-786
                   (ATB)

COMMISSIONER OF SOCIAL SECURITY,

             Defendant.

HOWARD D. OLINSKY, ESQ., for Plaintiff
LISA SMOLLER, Special Asst. U.S. Attorney, for Defendant

ANDREW T. BAXTER
United States Magistrate Judge

## MEMORANDUM-DECISION AND ORDER

This matter was referred to me, for all proceedings and entry of a final judgment, pursuant to the Social Security Pilot Program, N.D.N.Y. General Order No. 18, and in accordance with the provisions of 28 U.S.C. § 636(c), Fed. R. Civ. P. 73, N.D.N.Y. Local Rule 73.1 and the consent of the parties. (Dkt. Nos. 4, 7).

## I. PROCEDURAL HISTORY

On April 18, 2018, plaintiff protectively[2] filed an application for Disability Insurance Benefits ("DIB"), alleging that he became disabled on November 1, 2015 due

---

[1] In accordance with recent guidance from the Committee on Court Administration and Case Management of the Judicial Conference of the United States, which was adopted by the Northern District of New York in June 2018 in order to better protect personal and medical information of non-governmental parties, this Memorandum-Decision and Order will identify the plaintiff using only his first name and last initial.

[2] When used in conjunction with an "application" for benefits, the term "protective filing" indicates that a written statement, "such as a letter," has been filed with the Social Security Administration, indicating the claimant's intent to file a claim for benefits. *See* 20 C.F.R. §§ 404.630, 416.340. There are various requirements for this written statement. *Id.* If a proper statement is filed, the Social Security Administration will use the date of the written statement as the filing date of the application even if the formal application is not filed until a later date.

to post traumatic stress syndrome ("PTSD"), thoracolumbar arthritis, tinnitus, "post left knee surgery," left ankle ligament sprain, left ear hearing loss, and eye surgery. (Administrative Transcript ("T") 80-81, 184-90, 204). His application was denied initially on June 12, 2018. (T. 95). Plaintiff requested a hearing which was held on January 29, 2019 before Administrative Law Judge ("ALJ") Jennifer Gale Smith. (T. 33-78, 100). ALJ Smith issued an unfavorable decision on February 11, 2019 (T. 14-28), which became the Commissioner's final decision when the Appeals Council denied plaintiff's request for review on May 7, 2019 (T. 1-3).

## II.    GENERALLY APPLICABLE LAW

### A. Disability Standard

To be considered disabled, a plaintiff seeking disability insurance benefits or SSI disability benefits must establish that he is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months . . . ." 42 U.S.C. § 1382c(a)(3)(A). In addition, the plaintiff's

> physical or mental impairment or impairments [must be] of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hire if he applied for work

42 U.S.C. § 1382a(3)(B). The Commissioner uses a five-step process, set forth in 20 C.F.R. sections 404.1520 and 416.920, to evaluate disability insurance and SSI

disability claims.

> First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity. If he is not, the [Commissioner] next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which meets or equals the criteria of an impairment listed in Appendix 1 of the regulations. If the claimant has such an impairment, the [Commissioner] will consider him disabled with-out considering vocational factors such as age, education, and work experience… Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work. Finally, if the claimant is unable to perform his past work, the [Commissioner] then determines whether there is other work which the claimant can perform.

*Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982); *see* 20 C.F.R. §§ 404.1520, 416.920. The plaintiff has the burden of establishing disability at the first four steps. However, if the plaintiff establishes that his impairment prevents him from performing his past work, the burden then shifts to the Commissioner to prove the final step. *Id.*

**B. Scope of Review**

In reviewing a final decision of the Commissioner, a court must determine whether the correct legal standards were applied and whether substantial evidence supported the decision. *Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013); *Brault v. Soc. Sec. Admin. Comm'r,* 683 F.3d 443, 448 (2d Cir. 2012); 42 U.S.C. § 405(g). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012). It must be "more than a scintilla" of evidence scattered throughout the administrative record. *Id.* However, this standard is a very deferential standard of review, "even more

so than the 'clearly erroneous standard.'" *Brault,* 683 F.3d at 448.

"To determine on appeal whether an ALJ's findings are supported by substantial evidence, a reviewing court considers the whole record, examining the evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight." *Williams on behalf of Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988). However, a reviewing court may not substitute its interpretation of the administrative record for that of the Commissioner, if the record contains substantial support for the ALJ's decision. *Id. See also Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982).

An ALJ is not required to explicitly analyze every piece of conflicting evidence in the record. *See, e.g., Monguer v. Heckler*, 722 F.2d 1033, 1040 (2d Cir. 1983); *Miles v. Harris*, 645 F.2d 122, 124 (2d Cir. 1981) (Finding we are unwilling to require an ALJ explicitly to reconcile every conflicting shred of medical testimony). However, the ALJ cannot "pick and choose evidence in the record that supports his conclusions." *Cruz v. Barnhart*, 343 F. Supp. 2d 218, 224 (S.D.N.Y. 2004); *Fuller v. Astrue*, No. 09-CV-6279, 2010 WL 5072112 (W.D.N.Y. Dec. 6, 2010).

## III.   <u>FACTS</u>

Plaintiff was born on October 20, 1979 and was 39 years old at the time of the ALJ's hearing. (T. 36). Plaintiff has a Master's Degree in Mathematics and an undergraduate degree in Developmental Education. (*Id.*) Plaintiff subsequently took courses in Drafting and Design, but was forced to stop due to the closure of the school he was attending. (T. 36-37). Plaintiff testified that he did not transfer to another school because he had children to care for at home. (T. 37). The children's ages were 14, 5, 4

and 2. (*Id.*)  Plaintiff testified that he lived with his fiancée, and she was "currently on disability for a car accident." (*Id.*)  Even before his fiancée's accident, the plaintiff took care of the children who were home during the day.[3] (T. 38-39).  Care of the children was shared with his fiancée's parents, who lived "local[ly]." (T. 39).

Plaintiff testified that he could not work because he had a hard time sitting or standing for "a long period of time" and could not do "many stairs." (*Id.*)  He testified that he could lift from 20 to 25 pounds, but could not lift his son because he weighed 40 pounds. (*Id.*)  Plaintiff spent his days "hanging out" with the children, reading books, and watching television and YouTube. (T. 40).  Plaintiff stated that he cooked for the children, making macaroni and cheese, hot dogs, and Ramen noodles. (T. 40-41).  He was helping his fiancée with her crafting business.[4] (T. 41).  Plaintiff testified that he could do "light cleaning," vacuum, and fold the laundry if he could sit down "for a little bit." (T. 41-42).

Plaintiff stated that he had pain in his mid lower back, all the way down to his hips, a little bit in his neck, and in both knees.[5] (T. 42, 57).  Plaintiff testified that cold weather and "super hot weather" made the pain in his knees worse. (T. 57).  Sitting sometimes made the knee pain worse, and standing for too long "had a big effect," as did "walking around too much." (T. 57).  Plaintiff testified that he had to alternate between sitting and standing. (*Id.*)  Plaintiff also stated that he had some left ankle

---

[3] Plaintiff explained that he only took care of the two younger children who were not in school during the day. (T. 38).

[4] Before her car accident, plaintiff's fiancée worked for a health insurance company. (T. 41).

[5] Later, plaintiff testified that although he had pain in both knees, it was "mainly the left knee," and "[n]ot so much [the] right knee." (T. 44, 57).

strains. (T. 44).  The ALJ asked what the doctors were doing to address his pain. (T. 42).

Plaintiff testified that he was waiting for a "new" consultation on "massage therapy"

that would help with his back by loosening the muscles. (*Id.*)  Plaintiff also testified that

he was waiting to get a "new" consultation from "Dr. Brown" for his knees. (T. 57).

Plaintiff testified that he was in the military for many years, but he left active

service in 2013, and he left the National Guard in 2015. (*Id.*)  While he was in the

military, he was a combat engineer. (T. 42).  Plaintiff was "medically retired' from

active duty because of his back and his knees.[6] (T. 42-43).  In 2014, after he left the

military, plaintiff worked at Lowe's. (T. 43).  He was a "loader" in the contractor/heavy

construction department. (*Id.*)  He helped the contractors load their vehicles with

construction materials and equipment. (*Id.*)  Plaintiff testified that, although the

materials were often heavy, the contractors helped him when he was loading their

vehicles. (*Id.*)  Plaintiff stated that he was laid off from Lowe's because the company

only hired him as a seasonal worker, and the season ended.[7] (*Id.*)  Plaintiff testified that

he could do the work at Lowe's because they had equipment that would "make lifting a

lot easier." (T. 44).  The "pallet jacks" supported most of the weight, and when he used

the forklift, "that wasn't lifting a whole lot there." (*Id.*)  Plaintiff stated that the

maximum he ever lifted at Lowe's was 40 pounds. (T. 51).  Plaintiff stated that he did

miss a few days of work due to "the symptoms," but he only missed three days in the six

---

[6] Plaintiff testified that he had avoided taking the physical examination for three years, but was told that if he did not have an examination, the military would have to "put [him] out." (T. 43).

[7] Plaintiff testified that the company told the seasonal workers that they were going to keep their jobs, but none of these workers were hired for permanent positions. (T. 43).

months that he worked there. (T. 51-52).  Plaintiff then stated that he missed two days because of his back, but he never missed any days because he did not sleep at night or because of the PTSD symptoms. (T. 52).

Mentally, plaintiff testified that he had "a lot of depression, anxiety type." (T. 44). He stated that he did not like crowds, did not like going shopping, and did not really like to leave the house because he did not like people. (*Id.*)  Plaintiff stated that he took his children out, but did not like to go to crowded places, like the mall. (T. 45).  Plaintiff stated that, when he went to get groceries, he would go in and "get right out," he went to less crowded grocery stores, or he had the groceries delivered. (T. 45-46).  Plaintiff stated that, mentally, he could not work because of the stress, his anxiety, and his inability to deal well with other people. (T. 46).  He avoided stress with his children by playing with them "so it doesn't stress me out." (*Id.*)  He liked to be "interactive with them." (T. 46-47).  Plaintiff testified that he and his children played with "Big Legos" building blocks, built "Hot Wheels" tracks, and that he colored with them. (*Id.*)

Plaintiff stated that, although he had some problems with alcohol and drugs in the past, he was doing much better, and he was only drinking "sparingly."[8] (T. 47).  He stated that he was able to reduce the amount he drank by working out more, going to the gym, doing "small" cardio, walking on the treadmill, and using light weights. (T. 48). At the time of the hearing, plaintiff testified that he was going to the gym less because he was busy with the children, but that he had a "home gym," and that he would use "5, 10, 15 pound[]" weights. (*Id.*)  Plaintiff watched YouTube exercise videos, and he was

---

[8] Plaintiff testified that, at one point, he was drinking up to 18 beers per day. (T. 48).

trying to get into a swimming or yoga class at the VA. (T. 49).  Plaintiff stated that he
lifted the light weights for about thirty minutes, and in the summer, he walked outdoors,
while pushing his son's stroller. (*Id.*)

Plaintiff testified that the military gave him a "disability rating" of 80%, then
increased it to 100%. (T. 50).  Plaintiff stated that he thought that 60% of the disability
was due to the PTSD, and 40% was due to his back. (*Id.*)  As a combat engineer,
plaintiff stated that he was in charge of finding roadside bombs.[9]  He stated that he had
been "blown up a few times," and he was close to many of the bombs that blew up. (T.
50-51).  Plaintiff had a concussion, and it was originally believed that he had suffered a
traumatic brain injury. (T. 51).  Plaintiff testified that the PTSD started after that time.
(*Id.*)

Plaintiff testified that loud noises and "groups" would trigger his PTSD
symptoms. (T. 53).  Fireworks, balloons popping, and even slamming doors would get
him "startled." (*Id.*)  If he went to a restaurant, he had to sit with his back to a wall. (*Id.*)
He was having night terrors approximately twice per week, and he was only sleeping
about three hours per night. (*Id.*)  Plaintiff testified that he felt "drained" during the day,
and that he was taking Melatonin, but was not sure that it was helping. (T. 54).
However, he stated that it did not affect his ability to focus during the day. (*Id.*)  He
testified that "I can make myself focus . . . if I need to." (*Id.*)  He also took naps with his
son during the day. (*Id.*)

Plaintiff testified that he had "anger problems," and that he had gone to the

---

[9] Plaintiff was the recipient of three Purple Hearts. (T. 50).

emergency room with "potential suicide attempts." (*Id.*)  Plaintiff testified that his attempts at suicide occurred when he was drinking, but had not occurred at all since he stopped drinking and since he left his son's mother. (T. 54-55).  Plaintiff testified that he was depressed after leaving the military because he had no career path, and because he was getting divorced at that time. (T. 55).  However, at the time of the hearing, he was "in a better spot." (*Id.*)  Plaintiff also stated that his anger issues did not involve getting aggressive "toward people," and that he would "take it out on [himself] before [he took it out] on anybody else." (*Id.*)  He testified that once he went to the emergency room because he punched a wall and broke his hand. (*Id.*)

Plaintiff testified that occasionally, he said things that he did not mean to say, even to loved ones, but that he tried not to get angry in public and tried not to let the anger get "the best of [him]" because he did not "know who was around," and he did not wish to look bad in front of the children. (T. 56).  Plaintiff testified that his anger was "triggered" if people were nosy and critical. (T. 56-57).

Plaintiff testified that he had some hearing loss from an explosion, but that "they" did not "rate" him for hearing loss.  He had "ringing" in his left ear. (T. 57-58).  Plaintiff stated that he did not get the ringing in his ear all the time, but when it happened, he also got a headache. (T. 58).  He got migraine headaches "a couple" of times per month, but stated that they were "not as bad as they used to be." (*Id.*)  When he did get headaches, they could last from a couple of hours to a couple of days, and they would go away if he went into a dark room, wore headphones to shut out any noise, or wore his sunglasses in the house. (*Id.*)  Plaintiff stated that bright lights were a "trigger," but that outdoor lights

were worse.[10] (T. 58-59).

Plaintiff testified that two or three days per month his back pain was so bad that he could not get out of bed. (T. 62).  It depended on the weather and on "what [went] on the day before." (T. 62).  Plaintiff testified that the week after the ALJ hearing, he was planning on going to the Army/Syracuse lacrosse game. (T. 63-64).  He also stated that the previous year, he attended a Duke/Syracuse lacrosse game in which the Carrier Dome experienced a "record" attendance of 40,000 people. (T. 64).  Plaintiff stated that he had been to the Dome twice, and that lacrosse games did not get "packed." (*Id.*)

The ALJ heard testimony from VE DeStefano.  The VE reviewed plaintiff's prior work experience. (T. 69-70).  The ALJ asked the VE two hypothetical questions. (T. 70, 72).  The first hypothetical assumed that the individual could perform light work[11] with additional restrictions, and the second hypothetical assumed that the individual could perform sedentary work with additional restrictions. (*Id.*)  More specifically, the second hypothetical question assumed the ability to perform sedentary work, but that the individual could not climb ladders, ropes, scaffolds, and could not balance, kneel, crouch, or crawl. (T. 72).  The individual could occasionally stoop and climb ramps and stairs. (*Id.*)  He should be able to change positions every twenty minutes, but could stay on task at his workstation during the change in position.  The individual should not

---

[10] Plaintiff also stated that he had Lasik surgery, and that his eyes were "great," but that bright lights still bothered him. (T. 59).

[11] Because the ALJ determined that plaintiff was restricted to sedentary work, the court will focus only on the relevant hypothetical question.

work in any environment where the noise was greater than "moderate."[12]  He also

retained the ability to understand simple, oral instructions and could communicate

simple information. (*Id.*)  The individual should avoid work outdoors in bright sunshine

and work with bright or flickering lights as in welding or cutting metals.  He should

perform work with simple, routine, repetitive tasks.  He should work in a "low stress"

job, defined as one involving occasional decision making, judgment, and changes in the

work setting.  He should perform "goal-oriented" work, rather than "production pace-

rate" work. (*Id.*)  The individual should only have "occasional" contact with co-workers,

supervisors, or the public. (*Id.*)

Based on both hypothetical questions, the VE testified that plaintiff would not be

able to perform any of his past relevant work, but specifically with respect to the second

hypothetical, the individual could be a "Document Preparer" (sedentary, unskilled, with

an SVP of 2 and 46,563 positions in the national economy); a "Toy Stuffer" (sedentary,

unskilled, with an SVP of 2 and 4,173 positions nationally); and a "Table Worker"

(sedentary, unskilled, with an SVP of 2 and 2,957 positions nationally). (T. 73).  The

VE also testified that employers would tolerate a worker being off-task for 10% of the

time, and would tolerate absences of one day per month. (T. 74).  The VE testified that

all of her information was consistent with the DOT, but because the DOT did not

address time off-task and days absent from work, her estimate was based on her twenty-

five years of experience placing employees in jobs. (T. 74-75).

In response to questioning by plaintiff's counsel, the VE testified that if an

---

[12] The ALJ noted that "moderate" was defined in the Dictionary of Occupational Titles
("DOT").

individual could only respond properly to criticism one-third of the time, but otherwise reacted to criticism by cursing, yelling, punching walls, or self-harming, the individual could not perform any competitive employment. (T. 75). In addition, if the individual could only occasionally focus on, and carry out, work-related activities, he would not be able to perform any jobs. (T. 75-76). If the individual was required to take fifteen minute breaks every hour, he would be unable to perform any work. (T. 77).

There are a substantial number of medical records, many which are not relevant to plaintiff's arguments. Plaintiff's counsel has summarized the relevant medical evidence in his brief. (T. 3-8). Rather than summarizing the records at the outset, I will refer to the pertinent records during my discussion of the plaintiff's arguments, with any exceptions as noted herein.

## IV.   THE ALJ'S DECISION

After finding that plaintiff did not engage in substantial gainful activity ("SGA") after the alleged onset date, the ALJ found that plaintiff suffered from the following severe impairments at step two of the sequential evaluation: PTSD, major depressive disorder; anxiety disorder; substance abuse disorder; degenerative disc disease ("DDD") of the lumbar spine; multi-level disc protrusions in the thoracic spine; a history of left knee injury; collateral ligament strain of the left ankle; a history of traumatic brain injury ("TBI"); tinnitus; and hearing loss. (T. 17-18).

At step three of the evaluation, the ALJ found that plaintiff's impairments either singly or in combination did not meet the severity of a listed impairment. (T. 18-20). At step four, the ALJ found that plaintiff had the RFC for sedentary work with the additional restrictions contained in the second hypothetical question cited above. (T. 20,

20-26).  In making this determination, the ALJ considered plaintiff's alleged symptoms, together with all the medical and other evidence of record,[13] ultimately determining that plaintiff was not as limited as he alleged. (*Id.*)

With regard to plaintiff's physical limitations, the ALJ considered the opinions of consultative examiner, Kalyani Ganesh, M.D., who the ALJ found "generally persuasive" with regard to physical limitations, and Marietta Angelotti, M.D., a non-examining state agency medical consultant, who the ALJ found "generally persuasive." (T. 24).  With respect to plaintiff's mental limitations the ALJ discussed consultative psychologist, Jeanne Shapiro, Ph.D., whose report the ALJ found to be "a persuasive depiction of the claimant's remaining abilities." (T. 24-25).  The ALJ also considered a report by state-agency medical consultant Ophelia Austin-Small, Ph.D., whose report the ALJ found "partially persuasive," but stated that plaintiff had additional limitations based on medical reports submitted subsequent to Dr. Austin-Small's assessment. (T. 25).

The ALJ specifically analyzed the two reports by plaintiff's treating clinical psychologist, Dr. Michael Thompson, Ph.D., and found those reports "partially persuasive." (T. 25).  The ALJ concluded that her RFC evaluation was supported by the opinions of Dr. Ganesh, Dr. Shapiro, Dr. Austin-Small, and Dr. Thompson, together with the "objective medical evidence," and plaintiff's daily activities. (T. 26).

Based on the RFC and VE DeStefano's testimony, the ALJ determined, at step four of the sequential evaluation, that plaintiff could not perform any of his past relevant

---

[13] The ALJ specifically considered other agencies' determinations of plaintiff's "degree" of disability. (T. 25).

work, but based on VE DeStefano's testimony in response to the second hypothetical question, the ALJ found that plaintiff could perform the "representative occupations" of document preparer, toy stuffer, and table worker. (T. 26-27).  The ALJ specifically noted that the record did not support the additional limitations proposed by plaintiff's counsel at the hearing. (T. 27).  Thus, the ALJ found that plaintiff was not disabled at any time from his alleged onset date to the date of the ALJ's decision. (T. 27-28).

## V.   ISSUES IN CONTENTION

Plaintiff raises the following arguments in support of his position that the ALJ's decision is not supported by substantial evidence:

1.   The ALJ's RFC determination is not supported by substantial evidence because the ALJ failed to properly assess the opinion of plaintiff's treating psychologist. (Pl.'s Br. at 9-15) (Dkt. No. 9).

2.   The ALJ's step five determination is not supported by substantial evidence. (Pl.'s Br. at 15-18).

Defendant contends that the ALJ's decision is supported by substantial evidence, countering each of plaintiff's arguments. (Def.'s Br.) (Dkt. No. 10).  For the following reasons, this court agrees with the defendant and will affirm the Commissioner's decision.

## VI.   RFC and Treating Physician

### A.   Legal Standards

#### 1.   RFC

RFC is "what [the] individual can still do despite his or her limitations.

Ordinarily, RFC is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis. . . ." A "regular and continuing basis" means eight hours a day, for five days a week, or an equivalent work schedule. *Balles v. Astrue*, No. 3:11-CV-1386 (MAD), 2013 WL 252970, at *2 (N.D.N.Y. Jan. 23, 2013) (citing *Melville v. Apfel*, 198 F.3d 45, 52 (2d Cir. 1999) (quoting SSR 96–8p, 1996 WL 374184, at *2)); *Babcock v. Berryhill,* No. 5:17-CV-00580 (BKS), 2018 WL 4347795, at *12-13 (N.D.N.Y. Sept. 12, 2018); *Tankisi v. Comm'r of Soc. Sec.*, 521 F. App'x 29, 33 (2d Cir. 2013); *Stephens v. Colvin*, 200 F. Supp. 3d 349, 361 (N.D.N.Y. 2016).

In rendering an RFC determination, the ALJ must consider objective medical facts, diagnoses, and medical opinions based on such facts, as well as a plaintiff's subjective symptoms, including pain and descriptions of other limitations.  20 C.F.R. §§ 404.1545, 416.945.  *See Martone v. Apfel*, 70 F. Supp. 2d 145, 150 (N.D.N.Y. 1999) (citing *LaPorta v. Bowen*, 737 F. Supp. 180, 183 (N.D.N.Y. 1990)); *Kirah D. v. Berryhill*, No. 3:18-CV-0110 (CFH), 2019 WL 587459, at *8 (N.D.N.Y. Feb 13, 2019); *Genier v. Astrue,* 606 F.3d 46, 49 (2d Cir. 2010).  An ALJ must specify the functions plaintiff is capable of performing, and may not simply make conclusory statements regarding a plaintiff's capacities.  *Roat v. Barnhart,* 717 F. Supp. 2d 241, 267 (N.D.N.Y. 2010); *Martone v. Apfel*, 70 F. Supp. 2d at 150 (citing *Ferraris v. Heckler*, 728 F.2d 582, 588 (2d Cir. 1984); *LaPorta v. Bowen*, 737 F. Supp. at 183, *Stephens v. Colvin,* 200 F. Supp. 3d 349, 361 (N.D.N.Y. 2016); *Whittaker v. Comm'r of Soc. Sec.*, 307 F. Supp. 2d 430, 440 (N.D.N.Y. 2004).  The RFC assessment must also include a narrative discussion, describing how the evidence supports the ALJ's conclusions, citing specific

15

medical facts, and non-medical evidence.  *Natashia R. v. Berryhill*, No. 3:17-CV-01266 (TWD), 2019 WL 1260049, at *11 (N.D.N.Y. Mar. 19, 2019) (citing SSR 96-8p, 1996 WL 374184, at *7).

## 2.   Evaluating Medical Evidence

The regulations regarding the evaluation of medical evidence have been amended for claims filed after March 27, 2017,[14] and several of the prior Social Security Rulings, including SSR 96-2p, have been rescinded.  According to the new regulations, the Commissioner "will no longer give any specific evidentiary weight to medical opinions; this includes giving controlling weight to any medical opinion."  *Revisions to Rules Regarding the Evaluation of Medical Evidence* ("*Revisions to Rules*"), 2017 WL 168819, 82 Fed. Reg. 5844, at 5867–68 (Jan. 18, 2017), *see* 20 C.F.R. §§ 404.1520c(a), 416.920c(a).  Instead, the Commissioner must consider all medical opinions and "evaluate their persuasiveness" based on the following five factors: supportability; consistency; relationship with the claimant; specialization; and "other factors."  20 C.F.R. §§ 404.1520c(a)-(c), 416.920c(a)-(c).

Although the new regulations eliminate the perceived hierarchy of medical sources, deference to specific medical opinions, and assigning "weight" to a medical opinion, the ALJ must still "articulate how [he or she] considered the medical opinions" and "how persuasive [he or she] find[s] all of the medical opinions."  *Id.* at            §§ 404.1520c(a) and (b)(1), 416.920c(a) and (b)(1).  The two "most important factors for determining the persuasiveness of medical opinions are consistency and supportability,"

---

[14] This plaintiff's application was dated April 18, 2018.  Thus, the new regulations apply in his case.

16

which are the "same factors" that formed the foundation of the treating source rule. *Revisions to Rules*, 82 Fed. Reg. 5844-01 at 5853.

An ALJ is specifically required to "explain how [he or she] considered the supportability and consistency factors" for a medical opinion.  20 C.F.R. §§ 404.1520c (b)(2), 416.920c(b)(2).  With respect to "supportability," the new regulations provide that "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be." *Id.* at §§ 404.1520c(c)(1), 416.920c(c)(1). The regulations provide that with respect to "consistency," "[t]he more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." *Id.* at                §§ 404.1520c(c)(2), 416.920c(c)(2).

Under the new regulations an ALJ must consider, but need not explicitly discuss, the three remaining factors in determining the persuasiveness of a medical source's opinion.  *Id.* at §§ 404.1520c(b)(2), 416.920c(b)(2).  However, where the ALJ has found two or more medical opinions to be equally well supported and consistent with the record, but not exactly the same, the ALJ must articulate how he or she considered those factors contained in paragraphs (c)(3) through (c)(5).  *Id.* at §§ 404.1520c(b)(3), 416.920c(b)(3).

## B.    Application

Plaintiff argues that in determining his RFC, the ALJ did not properly consider

Dr. Thompson's medical opinions, contained in his progress notes.  One of these reports was written on July 9, 2015 (T. 1617-25), and the other was written on March 29, 2017 (T. 1307-14).  These appear to be the only two times that Dr. Thompson evaluated the plaintiff.  The ALJ found both reports to be "partially persuasive," based on Dr. Thompson's treating relationship with the plaintiff, but that the second report was "less persuasive" than the first. (T. 25).

In his 2015 report, Dr. Thompson stated that plaintiff's symptoms were "moderate," and that they resulted in moderate disruptions of his psychosocial functioning. (T. 1624).  Dr. Thompson stated that plaintiff's nightmares and flashbacks, although disruptive, were infrequent. (*Id.*)  He stated that the plaintiff presented with more persistent and prominent social anxiety, social avoidance, and hypervigilance in crowds. (*Id.*)  He stated that plaintiff avoided crowds as much as possible and ventured out of his apartment ***only when necessary***. (*Id.*) (emphasis added).

In 2015, Dr. Thompson also stated that plaintiff had recurrent episodes of verbal irritability that could be disruptive to relationships, including his girlfriend. (*Id.*)  Plaintiff suffered from frequent and disruptive startled reactions, episodes of emotional detachment and isolation.  Plaintiff slept only two to four hours per night.  However, Dr. Thompson also stated that the plaintiff was a full-time student, who was doing generally well in his classes.  Although he was experiencing mild anxiety and hypervigilance sitting in a crowded classroom, "he [was] dealing with that adequately." (*Id.*)  Dr. Thompson stated that if plaintiff was a candidate for competitive employment, these symptoms would cause "at least mild and episodic work-related difficulties in terms of maintaining appropriate emotional stability in work relationships." (*Id.*)  Dr. Thompson

concluded that the symptoms might cause some disruption in performing work-related activities, and that the "occupational impairment would likely be more prominent in a work setting that was high stress and one in which she [sic] would have to work together with others closely infrequently."[15] (*Id.*)

On March 29, 2017, Dr. Thompson wrote another report. (T. 1307-14).  Dr. Thompson had not seen plaintiff since his 2015 evaluation. (T. 1309).  Dr. Thompson's 2017 report contained many of the same findings, but also noted that when compared to 2015, plaintiff had a "significant increase" in the overall severity of his PTSD symptoms. (T. 1313-14).  Dr. Thompson stated that the "last time" that plaintiff was examined, his symptoms were "moderate," but that in 2017, they were "moderate to severe," including one "full-fledged" psychiatric hospitalization and one overnight hospital stay, secondary to these symptoms. (T. 1314).  Dr. Thompson stated that plaintiff had "persistent and moderate to severe disruptions in essentially all areas of his psychosocial functioning." (*Id.*)  Plaintiff was having one to two nightmares and one to two flashbacks per week. (*Id.*)

Dr. Thompson stated that "hypervigilance and social avoidance" had become "severe" symptoms for plaintiff and that he "rarely ventures out of [sic] any Krauter [sic] public venue"[16] and rarely left the house "unless absolutely necessary." (*Id.*)  He had frequent episodes of verbal irritability and was "markedly isolated and withdrawn,"

_____

[15] Unfortunately, the court finds that some of the transcribed sentences may have several typographical errors.  The court suspects that this sentence was meant to read "closely and frequently."

[16] The court has interpreted this clear transcription error as follows: "He rarely ventures out in any crowd or public venue."

with "prominent emotional numbing noted." (*Id.*)  The doctor stated that plaintiff's "ability to enjoy any daily activity of his solitary her[17] [sic] social is moderately to severely compromised." (*Id.*)

The report contains a long paragraph on employability. (*Id.*)  Dr. Thompson states that plaintiff was planning on being a full-time student in May of 2017, and that he "was" a candidate for gainful employment, but that the "current severity of his symptoms" would present "significant limitations" on his capacity to maintain himself in a behaviorally and emotionally stable manner.  His ability to maintain appropriate behavior and work relationships would be "limited," and he would experience mild to moderate disruptions in the ability to focus on, and carry out, work-related activities in a reliable and consistent manner secondary to his PTSD symptoms. (*Id.*)  However, Dr. Thompson concluded that "[g]iven the current severity of his symptoms, the most suitable type of work for this veteran will be relatively low stress work that he could do primarily by himself.  He would have marked difficulty in the work setting worry at the work [sic] consistently with others."[18] (*Id.*)

The ALJ found Dr. Thompson's assessments to be "partially persuasive" because of the doctor's treating relationship with the plaintiff, but found the 2017 report "less persuasive" than the 2015 report because the opinions in the 2017 report were not

---

[17] The court notes that several of Dr. Thompson's sentences do not make complete sense.  The court suspects that Dr. Thompson dictated his report, which was then transcribed.  I will attempt to clarify the sentences by reading them phonetically, which appears to help the meaning.  This part of the sentence may be "solitary or social."

[18] Unfortunately, it appears that the transcription is again incorrect because this sentence does not make sense.  However, the court believes that it was meant to read: "He would have marked difficulty in the work setting [***were he to work***] consistently with others." (T. 1314).

supported by the plaintiff's testimony, and the 2015 opinions were more consistent with the record. (T. 25).  The ALJ also stated that plaintiff's ability to perform "regular and continuing work" was an issue reserved for the Commissioner. (*Id.*)

The ALJ's analysis was supported by substantial evidence.  The ALJ considered the persuasiveness of Dr. Thompson's reports according to the new rules cited above. First, the ALJ found that the reports were partially persuasive because Dr. Thompson had a treating[19] relationship with the plaintiff.  However, the ALJ discussed the inconsistency of Dr. Thompson's statements at length, not because she was substituting her own opinion for that of Dr. Thompson, but because the plaintiff testified to a much greater level of activity than noted by Dr. Thompson in his 2017 report.

As stated above, in 2017, Dr. Thompson stated that plaintiff was withdrawn, "rarely" left the house unless absolutely necessary, and rarely ventured out into crowds or "public places."  However, as the ALJ noted in her decision, plaintiff was able to maintain employment at a home improvement store,[20] golf,[21] horseback ride,[22] play

---

[19] The court notes that it appears from the record that plaintiff only saw Dr. Thompson twice for purposes of evaluation, once in 2015 and once in 2017.  It is arguable that Dr. Thompson had only a minimal treating relationship with the plaintiff.  Neither party focuses on this issue, and the ALJ found that the doctor's treating relationship rendered his opinion partially persuasive.

[20] At his hearing plaintiff testified that, in the six months he worked at Lowe's, he went home three times because of his back, but never because of his PTSD. (T. 52).

[21] On July 21, 2017, plaintiff reported in a physical therapy evaluation that his knee was sore because he played 18 holes of golf the day before. (T. 1279).

[22] On August 11, 2017, (after Dr. Thompson's 2017 report), he was being seen for his back pain and reported that he fell off of a horse "last Saturday." (T. 1229).

hockey, ski, skate,[23] attend Syracuse University lacrosse games,[24] and take his son to the zoo. (T. 25).  The ALJ stated that these were all activities that took place "outside the home." (*Id.*)

Plaintiff argues that the ALJ stated erroneously that Dr. Thompson's opinion that plaintiff would have "marked difficulty working with others" was an issue reserved to the Commissioner. (Pl.'s Br. at 11).  If the ALJ had said that, she might have erred. However, the ALJ actually said that "Dr. Thompson states that the claimant would have marked difficulty working with others, specifying that the claimant rarely leaves the house unless it is absolutely necessary. . . . The claimant's ability to perform regular or continuing work is an issue reserved for the Commissioner." (T. 25).  The ALJ was correct in her statement that the ***ultimate issue*** of whether one can perform "regular or continuing work" and is, therefore, not disabled, is a determination that is reserved to the Commissioner. *Taylor v. Barnhart*, 83 F. App'x 347, 349 (2d Cir. 2003) (citing 20 C.F.R. § 404.1527(e)(1); *Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir.1999)). *See also Chambless v. Saul*, No. 19-CV-1724 (VEC) (JLC), 2020 WL 1909876, at *14 (S.D.N.Y. April 20, 2020) (the ultimate issue of disability is reserved to the Commissioner).

The ALJ focused on the fact that Dr. Thompson stated that plaintiff "rarely" left the house unless it was absolutely necessary, and that statement was not supported by the evidence in the record, nor was it supported by plaintiff's own description of his

---

[23] On October 26, 2018 (after Dr. Thompson's 2017 report), the plaintiff was being examined for his low back pain and reported that "he continues to walk regularly.  In the winter he ice skates regularly, plays adult ice hockey, and skis regularly to stay active." (T. 1746).

[24] During the ALJ hearing, plaintiff testified that he was going to the Syracuse University ("SU") lacrosse game against Army at the Dome and the year before, went to the SU/Duke lacrosse game, which was attended by approximately 40,000 people. (T. 63-64).

activities.  The plaintiff argues that all of the activities cited by the ALJ were "physical,"
and it was unclear how they related to plaintiff's mental limitations.  Counsel then states
that plaintiff only went to lacrosse games because there were "not crowded," and that
"the impact" of his one-time horseback riding trip could not be determined because he
fell off the horse. (Pl.'s Br. at 12, 14).  Plaintiff ultimately claims that "these physical
activities do not detract from Dr. Thompson's mental limitations." (*Id.*)

Plaintiff misses the point of the ALJ's statement.  True, the activities cited by the
ALJ were "physical,"[25] but they also required plaintiff to leave the house and interact
with other people, including the large crowds in attendance at sporting events.
Counsel's attempt to minimize the plaintiff's attendance at these events by stating that
lacrosse games were "not crowded" is not persuasive.

Plaintiff argues that sporadic activities are not inconsistent with mental illness and
that such an individual may be expected to have "good days and bad days," thus
plaintiff's activities are not inconsistent with his claims or inconsistent with Dr.
Thompson's 2017 findings.  While it is true that the ALJ cannot pick and choose
isolated or sporadic activities as the sole basis for finding that plaintiff can work, the
ALJ may consider the plaintiff's daily activities in her complete evaluation of the claim.
*Abaruza v. Berryhill*, 754 F. App'x 70, 71 (2d Cir. 2019) (citing *Poupore v. Astrue*, 566
F.3d 303, 307 (2d Cir. 2009) (stating that the ALJ correctly discussed plaintiff's daily
activities in his evaluation)).  The activities in which plaintiff admitted he was engaging
did not appear to be "sporadic."  Plaintiff admitted to engaging in some activities

---

[25] Plaintiff does not make any claims relative to the physical limitations in the RFC evaluation.

"regularly." (T. 1746) (ice skating, playing hockey, and skiing "regularly").  In this case, the ALJ correctly found that Dr. Thompson's statement that plaintiff left the house "only when necessary" or "rarely" went out in crowds or public places was not supported by the plaintiff's own statements and admitted daily activities to other providers.  This assessment is supported by plaintiff's activities before and after Dr. Thompson's report.

The ALJ found that Dr. Thompson's 2015 evaluation was more consistent with the other medical evidence of record, including the May 10, 2018 consultative opinion of Jeanne Shapiro, Ph.D., who found that plaintiff's manner of relating and social skills were adequate; his attention, concentration, and memory were intact; and his intellectual functioning was average. (T. 481).  Plaintiff told Dr. Shapiro that he spent his days doing chores, playing with his son, watching television, and going to the park and the zoo. (T. 482).  Plaintiff also told Dr. Shapiro that he got along with family and friends, and that his symptoms were largely controlled with treatment. (T. 480, 482).  Dr. Shapiro found moderate limitations in regulating emotions, controlling behavior, maintaining well-being, and interacting adequately with supervisors, co-workers, and the public. (T. 482).  She found mild to moderate limitations sustaining concentration and performing a task at a consistent pace. (*Id.*)  The ALJ found that Dr. Shapiro's opinion was "a persuasive depiction of the claimant's remaining abilities" because it was consistent with the record as a whole, she had the opportunity to examine the plaintiff, she had professional expertise, and extensive experience with agency standards. (T. 24-25).

The ALJ's analysis is also consistent with the plaintiff's testimony regarding his

ability to interact with others.  At the hearing, plaintiff testified that although he had anger issues, he was never aggressive toward people, and that he tried not to get angry in public because it would look bad for "the kids." (T. 56).  Plaintiff testified that once, he punched a wall, but he stated that he would "take it out" on himself before "anybody else." (T. 56).  He also testified that he was trying to control his anger, and although he had suicide attempts,[26] they were alcohol-related, and that he had no further attempts since he stopped drinking and left the "toxic relationship" with his son's mother. (T. 55).  Plaintiff also testified that, although he had some trouble sleeping which caused him to be tired, he stated that "I can sit down.  I can focus.  I can make myself focus on it if I need to." (T. 54).

Conflicts in the evidence are for the ALJ to resolve. *See, e.g.*, *Bliss v. Colvin*, No. 13-CV-1086 (GLS/CFH), 2015 WL 457643, at *7 (N.D.N.Y., Feb. 3, 2015) ("It is the ALJ's sole responsibility to weigh all medical evidence and resolve material conflicts where sufficient evidence provides for such.") (citing inter alia, *Micheli v. Astrue*, 501 F. App'x 26, 29 (2d Cir. 2012)).  In this case, the ALJ carefully reviewed the evidence and determined that Dr. Thompson's 2017 report was less persuasive than his first report, based primarily on Dr. Shapiro's 2018 report and on the evidence as a whole, including plaintiff's own testimony.  It is not error to refuse to adopt a medical source's restrictions when plaintiff himself admits to a greater degree of functionality. *See e.g. Salmini v. Comm'r of Soc. Sec.*, 371 F. App'x 109, 114 (2d Cir. 2010) (finding no error

---

[26] Dr. Thompson's opinion that plaintiff's symptoms had become more severe since the 2015 evaluation was based, in part, on plaintiff's suicide attempts and psychiatric hospitalizations in 2016. (T. 1310, 1313-14).

in the ALJ's general decision to adopt the doctor's findings except insofar as plaintiff admitted "to a greater degree of functionality . . . .") (citing *Wright v. Barnhart*, 473 F. Supp. 2d 488, 493 (S.D.N.Y.2007)).  Thus, the ALJ's RFC determination is supported by substantial evidence.

In any event, even if the ALJ erred in her analysis, any error was harmless.  In his more restrictive 2017 report, Dr. Thompson specifically suggested that "the most suitable type of work for this veteran will be relatively low stress work that he could do primarily by himself." (T. 1314).  The ALJ incorporated these limitations into the RFC.  As stated above, the ALJ found that plaintiff was limited to simple, routine, and repetitive tasks, in a low stress job, and he should have only "occasional" contact with co-workers, supervisors, and the public. (T. 20).  "Occasional" is defined as up to one third of the day. *Daragjati v. Colvin*, No. 14 Civ. 2727(BMC), 2015 WL 427944, at *9 (E.D.N.Y. Jan. 31, 2015) (citing U.S. Dep't of Labor, Dictionary of Occupational Titles (4th ed.1991). Thus, the RFC established by the ALJ was consistent with Dr. Thompson's opinion regarding a "suitable type of work" for plaintiff.

## VII.   Step Five Analysis/Job Numbers

### A.   Legal Standards

At step five of the disability analysis, the burden shifts to the ALJ to demonstrate that there is other work in the national economy that plaintiff can perform.  *Poupore v. Astrue*, 566 F.3d at 306.  "Work which exists in the national economy" means work existing in significant numbers "either in the region where the individuals live or in several regions of the country." *McCusker v. Comm'r of Soc. Sec.*, No. 1:13-CV-1074, 2014 WL 6610025, at *3 (N.D.N.Y. Nov. 20, 2014) (quoting SSR 82-53, 1982 WL

3134, at *3 (1982) (internal quotation marks removed).

In the ordinary case, the ALJ carries out this fifth step of the sequential disability analysis by applying the applicable Medical-Vocational Guidelines ("the Grids"). *Id.* "Although the grids are 'generally dispositive, exclusive reliance on [them] is inappropriate' when they do not fully account for the claimant's limitations." *Martin v. Astrue*, 337 F. App'x 87, 90 (2d Cir. 2009) (citation omitted).  When significant nonexertional impairments[27] are present or when exertional impairments do not fit squarely within Grid categories, the testimony of a VE is required to support a finding of residual functional capacity for substantial gainful activity.  *McConnell v. Astrue*, 6:03-CV-0521 (TJM), 2008 WL 833968, at *21 (N.D.N.Y. Mar. 27, 2008) (citing, *inter alia*, *Bapp v. Bowen*, 802 F.2d 601, 605 (2d Cir. 1986).

## B.    Application

In this case, the ALJ used a VE at step five to determine whether, given plaintiff's RFC for sedentary work with additional limitations, there were a significant number of jobs that plaintiff could still perform.  The ALJ found that plaintiff could perform three representative jobs, discussed by the VE at the hearing: document preparer (46,563 positions nationally), toy stuffer (4,173 positions nationally), and table worker (2,957 positions nationally). (T. 26-27, 73).

Plaintiff claims that, even if the ALJ's RFC was correct, there is a conflict in the VE's testimony, and plaintiff cannot perform the document preparer job.  Plaintiff states

---

[27] A "nonexertional" limitation is a limitation or restriction imposed by impairments and related symptoms, such as pain, that affect only the claimant's ability to meet the demands of jobs other than the strength demands.  20 C.F.R. §§ 404.1569a(c), 416.969a(c).

that an individual who is limited to simple, routine, and repetitive tasks cannot do the "level three" reasoning required to be a document preparer.[28] (Pl.'s Br. 15-18).  Plaintiff argues that if he cannot perform the job of document preparer, of which there are over 40,000 in the national economy, then the remaining numbers of jobs that he can perform (toy stuffer and table worker), are too low to be "significant."[29] (*Id.*)  Plaintiff cites cases from other circuits for this argument, and states that the "authority in this Circuit is scant." (Pl.'s Br. at 17).

However, *Michael C. V. Comm'r of Soc. Sec.*, No. 6:17-CV-920 (GLS), 2018 WL 4689092, at *4 (N.D.N.Y. Sept. 28, 2018), Senior U.S. District Court Judge Gary L. Sharpe found that

> [s]pecifically, Michael's contention that unskilled work is incompatible with a GED reasoning level of three is mistaken. *See Maenza v. Colvin*, [No.]14-CV-6596, 2016 WL 1247210, at *14 (W.D.N.Y. Mar. 24, 2016) (holding plaintiff limited to unskilled work could perform work with a GED level of three) (citing cases); *Healy v. Colvin*, No. 3:15-cv-01579, 2016 WL 4581403, at *7 (D. Conn. Sept. 2, 2016) (holding limitation to unskilled work "not inconsistent with either jobs requiring GED level 2 or 3 reasoning") (internal quotation marks and citation omitted). . . . Finally, Michael's educational

---

[28] "A [General Educational Development] GED reasoning level 2 requires an individual to '[a]pply commonsense understanding to carry out detailed but uninvolved written or oral instructions.'" *Jones-Reid v. Astrue*, 934 F. Supp. 2d 381, 408 n.15 (D. Conn. 2012), *aff'd*, 515 Fed. Appx. 32 (2d Cir. 2013) (citing Appendix C, Dictionary of Occupational Titles (4th Ed., Rev. 1991) available at http://www.oalj.dol. gov/PUBLIC/DOT/REFERENCES/DOTAPPC. HTM.)  "A GED reasoning level 3 requires individuals to '[a]pply commonsense understanding to carry out instructions furnished in written, oral, or diagrammatic form.'" *Id*.

[29] Plaintiff claims that in order to be significant, the number of jobs available to an individual must be at least 10,000. (Pl.'s Br. at 18) (citing *Hamilton v. Comm'r of Soc. Sec.*, 105 F. Supp. 3d 223, 231 (N.D.N.Y. 2015) (citing *Vining v. Astrue*, 720 F. Supp. 2d 126, 136 (D. Me. 2010)).  Without the document preparer job, plaintiff's available jobs are reduced to 7,130 (toy stuffer and table worker together), and this number is lower than the minimum 10,000 jobs.

> background—he has his GED and had a CDL, (Tr. at 73)—is
> consistent with the requirements of a GED reasoning level
> three job. *See Maenza*, 2016 WL 1247210, at *14.

Since Senior Judge Sharpe's decision in *Michael C.*, an additional court in this district

has come to the same conclusion.  In *Kelly D. v. Saul*, No. 5:18-CV-1190 (DJS), 2019

WL 6683542, at *5 (N.D.N.Y. Dec. 6, 2019), Magistrate Judge Daniel Stewart held that

> [w]hile there is some dispute among the courts, "a number of
> courts have held that jobs with DOT reasoning levels of two or
> three are compatible with limitations to simple and low stress
> work." *McCusker v. Comm'r of Soc. Sec.*, 2014 WL 6610025,
> at *4 (N.D.N.Y. Nov. 20, 2014) (citing *Reynolds v. Comm'r of
> Soc. Sec.*, 2012 WL 2050410, at *6 (N.D.N.Y. June 6, 2012);
> *Jones-Reid v. Astrue*, 934 F. Supp. 2d 381, 408-09 (D. Conn.
> 2012), *aff'd*, 515 Fed. Appx. 32 (2d Cir. 2013); *Cross v.
> Astrue*, 2009 WL 3790177, at *8 (N.D.N.Y. Nov. 12, 2009);
> *Terry v. Astrue*, 580 F.3d 471, 478 (7th Cir. 2009); *Renfrow v.
> Astrue*, 496 F.3d 918, 921 (8th Cir. 2007)); *see also Decker v.
> Comm'r of Soc. Sec.*, 2014 WL 2176960, at *4-5 (N.D.N.Y.
> May 22, 2014).

In this case, I found that the ALJ's RFC is supported by substantial evidence,

thus, the hypothetical question posed by the ALJ was proper.  In the response to the

hypothetical question, the VE was directed to consider plaintiff's restriction to low

stress work, with simple, routine, and repetitive tasks. (T. 72).

*Kelly D.* involved facts similar to this case.  The VE considered that Kelly D.,

who was also limited to low stress, simple, routine work, could perform the jobs of,

inter alia, "document preparer." *Id.*  Magistrate Judge Stewart agreed with the "'growing

number of courts [that] have held that jobs with DOT reasoning levels of two or three

are compatible with limitations to simple, routine work.'" *Id.* (quoting *Haiss v.

Berryhill*, No. 17-CV-8083, 2019 WL 3738624, at *11 (S.D.N.Y. May 15, 2019), *report

*and recommendation adopted sub nom*. *Haiss v. Comm'r of Soc. Sec.*, 2019 WL 5690712 (S.D.N.Y. Nov. 4, 2019)).  This court agrees with Magistrate Judge Stewart's reasoning and finds that there is no inconsistency in the VE's testimony that this plaintiff could perform the job of document preparer.[30]

The court would note that plaintiff has a substantial amount of education. He holds an undergraduate degree in developmental education and a masters degree in mathematics.  Plaintiff's mental impairments and limitations are, for the most part, related to his PTSD and his alleged inability to leave the house and work with others. His reasoning and ability to make decisions are not seriously questioned.  Based on the above, I find that ALJ's determination that the plaintiff could perform the three representative jobs described by the VE is supported by substantial evidence.

**WHEREFORE**, based on the findings above, it is

**ORDERED**, that the decision of the Commissioner is **AFFIRMED** and this case **DISMISSED**, and it is

**ORDERED**, that the Clerk enter judgment for **DEFENDANT**.

Dated: June 10, 2020

Andrew T. Baxter
U.S. Magistrate Judge

---

[30] Because I have found that the plaintiff can perform the job of document preparer, it is not necessary for me to reach plaintiff's final argument that the two remaining jobs do not constitute "significant numbers" on their own.